IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Richard L. Grutsch,

    Plaintiff,                                                      Case No: 2:15-cv-2583

    v.                                                          Judge Graham

Wells Fargo Bank, N.A.,

    Defendant.

Opinion and Order

    Plaintiff Richard L. Grutsch brings this action under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, against defendant Wells Fargo Bank, N.A. Grutsch alleges that Wells Fargo violated RESPA and the regulations promulgated thereunder by failing to timely evaluate him for loss mitigation options, improperly requesting him to provide supplemental information, and failing to provide him with specific reasons for the denial of his loss mitigation application.

    This matter is before the court on the parties' cross-motions for summary judgment. The primary issue raised is whether under Regulation X, 12 C.F.R. part 1024, Grutsch's claim fails because he failed to submit his loss mitigation application more than 37 days before the foreclosure sale that was scheduled for his home. As set forth below, the court finds that Grutsch's claim does fail for this reason and that, in any event, Wells Fargo fully complied with Regulation X in the course of voluntarily considering the application.

**I.    Background**

    Wells Fargo was the servicer on a home mortgage loan in the amount of $255,000 against real property owned by Grutsch on Sandhurst Drive in Lewis Center, Ohio. (Doc. 32-18 at PAGEID#1259). In April 2011, Wells Fargo filed a foreclosure action in the Delaware County Court of Common Pleas against Grutsch, alleging that $221,000 was still owing on the mortgage. (Doc. 32-27 at 1299). The parties were unsuccessful in their attempts at mediation after the foreclosure action was filed. The proceeding was stayed when Grutsch filed for bankruptcy relief in June 2012.

After the bankruptcy proceeding was closed, the foreclosure action was reopened in June 2014. The state court entered judgment for Wells Fargo on September 16, 2014, and on September 29, 2014, the court ordered the Delaware County Sheriff to appraise, advertise and sell the property. In the Delaware Gazette on November 3, 2014, the Sheriff published a notice of sale of Grutsch's property set for November 26, 2014. (Doc. 40-5 at 3198). The notice was published again on November 10 and 17, 2014.

On November 18, 2014 Grutsch, through legal counsel,[1] submitted a Uniform Borrower Assistance Form to Wells Fargo. (Doc. 12-2 at 127). On November 24, 2014 Wells Fargo moved to withdraw the property from the sheriff's sale, and the sale was vacated.

The Uniform Borrower Assistance Form instructed the borrower to submit certain documents, depending upon which types of income they had reported. Grutsch indicated that he received monthly wages of $7500, that he was self-employed[2] and that he received monthly rent income of $1900. (Doc. 12-2 at 128). He did not, however, submit the required recent pay stubs relating to his wages or a 2013 federal income tax return, including tax forms relating to his self-employed income. He did submit a 2013 federal income tax Schedule E relating to rental income which he and his wife, Lori Grutsch, received from a separate piece of property they owned on Old State Road in Lewis Center.

By letter dated November 26, 2014, Wells Fargo notified Grutsch that it had received his loan modification application and that it needed additional information in order to process his request. (Doc. 12-3 at 161). Wells Fargo stated that it needed: pay stubs covering the most recent 30 days; complete 2013 federal income tax returns, including all tax filings relating to any business interests; and a recent quarterly profit and loss (P&L) statement relating to each business.

On December 17, 2014 Grutsch provided an unsigned and undated copy of his 2013 joint federal income tax return. (Doc. 12-9 at 210). It showed that neither he nor his wife earned wages in 2013. The only business indicated on Schedule C of the return was RLG Development LLC, for which Lori Grutsch was reported to be the sole proprietor and for which a net loss of nearly $19,000 in 2013 was reported. (Id. at 213). Grutsch additionally submitted a P&L statement for

---

[1] The series of requests and responses described below were exchanged via email by legal counsel on behalf of Grutsch and Wells Fargo.

[2] Grutsch checked a box for being self-employed but did not list any monthly self-employed income. It is unclear whether the amount of wages he listed in the gross wages box actually was meant to reflect his self-employed income.

RLG showing that it was RLG which had received the rental income listed on the Uniform Borrower Assistance Form and that RLG had a year-to-date net profit of $220,000. (Id. at 242). On its face, the P&L statement appeared to include personal expenses which the Grutsches charged against RLG. (Id. at 241-42). Also included in the December 17 submission was a Schedule E which indicated the existence of another business entity, RC Realty Investments LLC, inasmuch as a carryover for a prior year's unallowed loss was claimed in connection with RC Realty. (Id. at 218). But Grutsch did not include tax documents or a P&L statement for RC Realty.

On December 22, 2014 Wells Fargo acknowledged receipt of the documents, and on December 31 Wells Fargo made a second request for documents from Grutsch. (Doc. 12-10 at 246; Doc 12-12 at 251). Wells Fargo requested that Grutsch provide the following by January 30, 2015: tax return documents for RC Realty, a recent P&L statement for RC Realty, an updated P&L statement for RLG, a list of mortgage loan statements for other properties owned by Grutsch, recent homeowners' association dues statements, and a statement clarifying whether the rental income was personal income or business income for RLG.

On February 2, 2015 Grutsch responded with two December 2014 mortgage loan statements from a different lender showing that he owed monthly amounts of $1967 and $156 on those loans. (Doc. 12-13 at 258-59). But the loan statements did not identify the property or properties which secured the loans. Grutsch also provided a recent bank statement for a business checking account in RC Realty's name. (Id. at 262). And he included a letter stating, without explanation, that the rental income was "in fact related to the personal business." (Id. at 261). Grutsch did not provide any P&L statements, tax returns or HOA statements.

In the months that followed, Wells Fargo continued to request information from Grutsch to gain a correct understanding of his business interests and financial standing. The responses it received from Grutsch continued to be incomplete and confusing at times and led to new questions or concerns.[3] For instance, he provided seemingly conflicting information about the ownership and rental income arrangement for the Old State Road property. (Doc. 12-21 at 458-60; Doc. 12-28 at 632, 666, 809-15). Moreover, it took numerous requests by Wells Fargo to obtain tax returns and P&L statements for RC Realty; those documents showed that RC Realty had operated at a loss in 2013 and 2014. (Doc. 12-21 at 453-56; Doc. 12-28 at 677). And after providing updated P&L

---

[3] Wells Fargo's briefs contain a thorough description of the exchanges between the parties. (Doc. 40 at 2515-22; Doc. 44 at 3249-57). The exchanges, which total nearly 800 pages in length, are part of the record. (Docs. 12-1 through 12-40 at 68 to 863). The court finds it unnecessary to the disposition of this case to recite them in full detail.

statements for RLG that showed a loss of $90,000 in the first quarter of 2015, Grutsch submitted a revised P&L statement for 2014 that lowered the previously-reported net profit from $220,000 to $160,000. (Doc. 12-39 at 852).

On June 11, 2015, Grutsch provided a letter from an individual who stated that he was RLG's accountant. The letter acknowledged that the P&L statements which had been submitted to Wells Fargo contained several accounting errors and that non-businesses expenses had been charged against RLG. (Doc. 12-36 at 842). On July 6, 2015, Wells Fargo received the revised 2014 P&L statement for RLG, which not only substantially lowered the reported net profit but also did not correct the errors identified in the June 11 letter. On that same day, Wells Fargo received too a 2013 P&L for RLG, showing a net profit of $150,000, even though the Grutsches had claimed a net loss of almost $19,000 on their 2013 Schedule C. (Doc. 12-39 at 852).

Upon receiving the 2013 and 2014 P&L statements on July 6, Wells Fargo decided that it had sufficient information to deem Grutsch's loan modification application to be complete and to evaluate his loan modification options. (Doc. 40-1 at 2543, Penno Decl., ¶ 32).

On July 17, 2015 Wells Fargo issued two letters notifying Grutsch that it had evaluated him for a loan modification and that he did not meet the requirements for either one of Wells Fargo's modification programs (Doc. 12-40 at 854) or for the federal government's Home Affordable Modification Program (Doc. 12-40 at 859). Both letters explained that based on the documents Wells Fargo had obtained: "[W]e are unable to create an affordable mortgage payment that still meets the requirements of the program. We reached this decision by reviewing your monthly gross income, which is calculated as $2,629.00, along with reviewing the other information you provided. Your gross monthly income is your income before taxes and other deductions."[4] (Doc. 12-40 at 854, 855, 859).

The letters also contained a notice of the right to appeal and instructions for how to submit an appeal. Grutsch did not appeal the denial of his loan modification request.

The Sandhurst Drive property was sold at sheriff's sale on December 16, 2015. (Doc. 30-19 at 1042).

---

[4] Grutsch's 2014 federal income tax return reported total income of $42,877 and adjusted gross income of $28,136. (Doc. 34-7 at 1639).

**II.	Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. Regulation X

"RESPA is a consumer protection statute, which Congress passed in order to reform the real estate settlement process. The statute was intended to ensure that consumers received information about settlement costs, and to protect them from high settlement fees and the potentially abusive practices of providers." Augesnstein v. Coldwell Banker Real Estate LLC, No. 2:10-cv-191, 2011 WL 3837096, at *2 (S.D. Ohio Aug. 30, 2011).

Regulation X requires mortgage servicers to evaluate a loss mitigation application received "45 days or more before a foreclosure sale." 12 C.F.R. § 1024.41(b)(2). Within 5 days of receipt of the application, the servicer must notify the borrower that the application has been received and must state whether the application is complete or incomplete. 12 C.F.R. § 1024.41(b)(2)(i)(B). A "complete" application is one for which the servicer "has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1). If the application is incomplete, the servicer must state what documents or pieces of information are needed and provide a reasonable date by which the borrower should respond. Id. at § 1024.41(b)(2)(i), (ii).

Upon receiving a complete application, the servicer must determine and notify the borrower within 30 days whether he is eligible for any loss mitigation options. 12 C.F.R. § 1024.41(c)(1). "But a servicer only has a duty to evaluate a complete loss mitigation application that it receives 'more than 37 days before a foreclosure sale.'" Lage v. Ocwen Loan Servicing LLC, 839 F.3d 1003, 1006 (11th Cir. 2016) (quoting 12 C.F.R. § 1024.41(c)(1)). If a servicer denies an application, the notice must state "the specific reason or reasons for the servicer's determination." 12 C.F.R. § 1024.41(d). A servicer must permit an appeal process if a complete loss mitigation application is received 90 days or more before a foreclosure sale. Id. at § 1024.41(h)(1).

A borrower may enforce Regulation X by private right of action created under RESPA. See 12 C.F.R. § 1024.41(a); 12 U.S.C. § 2605(f). Here, the complaint alleges that Wells Fargo violated Regulation X by failing to timely evaluate Grutsch's application for loss mitigation, improperly requesting supplemental information and failing to state specific reasons for the denial of his application.

#### B. Regulation X does not apply because the Application was Untimely

In its motion for summary judgment, Wells Fargo argues that it had no obligation to evaluate the November 18, 2014 loss mitigation application because, even assuming for argument's

sake that the application was complete, it was not received more than 37 days before the foreclosure sale scheduled for November 26, 2014. In his cross-motion for summary judgment, Grutsch argues that the original date scheduled for the sheriff's sale should be disregarded because the actual sale did not occur until December 16, 2015. Using the actual sale date as his reference, Grutsch contends that Wells Fargo violated Regulation X by not acknowledging receipt of the loss mitigation application within 5 days and by not evaluating the application within 30 days.

Wells Fargo has the better of the argument over whether the scheduled date or the actual date of the foreclosure sale controls. Regulation X applies when "a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale." 12 C.F.R. § 1024.41(c)(1)); see also id. at § 1024.41(b)(2) (imposing duties on servicer when "servicer receives a loss mitigation application 45 days or more before a foreclosure sale"). Given the duties which the servicer must quickly perform – in as few as five days – it is upon receipt of the application that the servicer must determine whether Regulation X applies or not. If a foreclosure sale has already been scheduled at the time of receipt of the application, then a natural reading of the provision is that the servicer must determine whether the application was received a sufficient number of days in advance of the sale and, if so, comply with the time-sensitive obligations imposed by Regulation X. This reading is confirmed by another provision of Regulation X that provides:

> Determining protections. To the extent a determination of whether protections under this section apply to a borrower is made on the basis of the number of days between when a complete loss mitigation application is received and when a foreclosure sale occurs, such determination shall be made *as of the date a complete loss mitigation application is received*.

Id. at § 1024.41(b)(3) (emphasis added).

The courts that have addressed this issue have reached the same conclusion. Notably, the Eleventh Circuit found in Lage, "Regulation X directs us to use the date on which the foreclosure sale was *scheduled* . . . ." 839 F.3d at 1009-10 (citing 12 C.F.R. § 1024.41(b)(3)) (emphasis added). The court continued:

> In other words, to determine whether the Borrowers' application was timely, we must ask whether, when the Borrowers submitted their complete loss mitigation application on January 27, more than 37 days remained before the foreclosure sale was scheduled to occur. [12 C.F.R. § 1024.41(b)(3)]. Because we determine timeliness based on the scheduled date of the foreclosure sale as of the date the Borrowers' complete application was received, *it is irrelevant to our timeliness analysis that Ocwen subsequently rescheduled the foreclosure sale* for a later date. See id.

> The Borrowers argue that we must use the date when the property was actually sold at foreclosure to assess whether their application was timely. They assert that because § 1024.41(b)(3) discusses when the foreclosure sale "occurs," the relevant date for measuring timeliness is the date the foreclosure sale actually transpires. But this interpretation is inconsistent with the final clause of paragraph (b)(3), which plainly states that we must measure the proximity between the date of the foreclosure sale and the receipt of the complete loss mitigation application "as of the date a complete loss mitigation application is received." Id. We cannot adopt the Borrowers' interpretation because it would render this phrase in the regulation meaningless.

839 F.3d at 1010 (emphasis added). Accord Garmou v. Kondaur Capital Corp., No. 15-12161, 2016 WL 3549356, at *5 (E.D. Mich. June 30, 2016) ("If the court were to accept Plaintiff's argument (that the phrase 'before a foreclosure sale' means when a foreclosure sale ultimately occurred rather than when it was scheduled), subsection 1024.41(b)(3)'s mandate that the determination of the regulation's applicability be made 'as of the date a complete loss mitigation application is received would have no effect.'"). See also Wong v. Fay Servicing, LLC, No. 16-CV-03074-BLF, 2017 WL 950863, at *4 (N.D. Cal. Mar. 10, 2017) ("Fay's postponement of foreclosure, however, does not change the untimeliness of the Plaintiffs' application."); cf. Dionne v. Fed. Nat'l Mortg. Ass'n, No. 15-CV-56-LM, 2016 WL 6892465, at *9 (D.N.H. Nov. 21, 2016) (agreeing with Lage that timeliness is determined as of the date of the receipt of the application, but distinguishing it on the facts because "[h]ere, however, Chase cancelled the foreclosure sale before receiving the Dionnes' complete application on October 17, 2014.").

As the court in Lage noted, the Consumer Financial Protection Bureau agrees with this interpretation of Regulation X. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (deference given to an agency's interpretation of its own regulation unless "plainly erroneous or inconsistent with the regulation"). "After receiving questions about how the timing provisions in § 1024.41 worked when a foreclosure sale was rescheduled after a completed application was received, the Bureau explained that 'for purposes of § 1024.41, timelines based on the proximity of a foreclosure sale to the receipt of a complete loss mitigation application will be determined as of the date a complete loss mitigation application is received.'" Lage, 839 F.3d at 1010 (quoting Amendments to the 2013 Mortgage Rules, 78 Fed. Reg. 60382, 603997 (Oct. 1, 2013)). The Bureau reasoned that "structuring the rule such that a borrower's rights may be added or removed because a foreclosure sale was moved or rescheduled would not provide the certainty or simplicity created by the proposed rule." 78 Fed. Reg. 60382, 60397. The Bureau further recognized that "if moving a foreclosure sale to a later date could trigger new protections, such a policy may provide a disincentive for a servicer to reschedule a

foreclosure sale for a later date." Id. "The Bureau thus made clear that an untimely application should not become timely simply because the servicer rescheduled a foreclosure sale." Lage, 839 F.3d at 1010.

Here, Wells Fargo received Grutsch's loss mitigation application just eight days before the foreclosure sale that was then scheduled to take place. That Wells Fargo managed six days later to have the sale vacated did not make the application timely or invoke the protections of Regulation X. See Lage, 839 F.3d at 1010-11 ("[A]llowing a servicer's delay of a foreclosure sale to give a borrower greater rights may discourage servicers from rescheduling foreclosure sales and voluntarily considering untimely applications – actions which benefit borrowers."). Accordingly, Regulation X does not apply and Wells Fargo is entitled to summary judgment.

      **C.**      **Wells Fargo fully complied with Regulation X in any event**

The court further finds that in the course of voluntarily considering the loss mitigation application, Wells Fargo complied with Regulation X. Incredibly, Grutsch faults Wells Fargo for taking six days (excluding weekends under 12 C.F.R. § 1024.41(b)(2)(B)) instead of five to provide him with notice that it had received his application and request additional documents. It suffices to observe that but for the actions of Wells Fargo to have the foreclosure sale canceled, the application would not have been considered at all. Wells Fargo provided a notice of receipt to Grutsch just two days after the sale was vacated.

Regarding Wells Fargo's requests for additional documents, Grutsch asserts that his initial application was complete and renewed in its completion each and every time he submitted additional documents. Grutsch argues that Wells Fargo's requests were duplicative and unnecessary and that Wells Fargo violated Regulation X every time it opted to request more documents rather than to grant or deny his application.

The evidence thoroughly contradicts Grutsch's assertions. In his initial application, Grutsch did not submit the income documentation (including a federal income tax return) which the Uniform Borrower Assistance Form plainly instructed him to provide. When Wells Fargo made requests for supplemental information, Grutsch persisted in providing incomplete and inaccurate information that often raised new questions, forcing Wells Fargo to make additional rounds of requests. It took ten rounds of requests (and a point-blank admission of accounting errors) before Wells Fargo finally obtained sufficiently reliable information for it to evaluate Grutsch for available loan modification programs.

Regulation X affords servicers latitude in determining what information is needed in evaluating applications. The Regulation itself allows servicers to request "the documents and information necessary to make the loss mitigation application complete," though a duty of "reasonable diligence" is imposed on servicers during the information-gathering process. 12 C.F.R. § 1024.41(b)(1), (b)(2)(ii), (c)(2)(ii). The Bureau's official interpretation confirms that "[a] servicer has flexibility to establish its own application requirements and to decide the type and amount of information it will require from borrowers applying for loss mitigation options." 12 C.F.R. part 1024, Supp. I, Interpretation of § 1024.41, ¶ 1. Upon review of the exchanges made between Wells Fargo and Grutsch, the court finds as a matter of law that Wells Fargo acted with reasonable diligence in requesting information that would verify the nature, source and amount of the income received and of the expenses and liabilities incurred by Grutsch, his wife and their businesses. The court further finds as a matter of law that the requested information was necessary for Wells Fargo to properly evaluate Grutsch's application.

Finally, Grutsch contends that Wells Fargo failed to provide specific reasons for its denial of the application. Grutsch admits that the July 17, 2015 letters clearly stated that his monthly gross income was insufficient for the requirements of the potentially available programs. Wells Fargo also stated, in compliance with Regulation X, that "[o]nce we determined that you did not meet the requirements for a particular program, we did not continue to evaluate that program based on other criteria." (Doc. 12-40 at 855); see 12 C.F.R. § 1024.41(d) (servicer must state "if applicable, that the borrower was not evaluated on other criteria"). However, Grutsch argues that Regulation X's simple requirement of a "specific reason or reasons for the servicer's determination" should be interpreted as imposing a burden on the servicer to "provide what documentation was used or the method of calculations in the determination." (Doc. 30 at 927). Grutsch provides no legal support for this assertion. The court finds as a matter of law that Wells Fargo complied with the requirement to provide a specific reason for the denial. To the extent Grutsch believed that Wells Fargo made a mistake in its calculation, his remedy would have been to exercise his right to appeal, which he did not do.

## IV. Conclusion

Accordingly, plaintiff's motion for summary judgment (Doc. 30) is DENIED and defendant's motion for summary judgment (Doc. 44) is GRANTED. The Clerk of Court shall enter

judgment in favor of defendant.

                                                   s/ James L. Graham
                                                   JAMES L. GRAHAM
                                                   United States District Judge

DATE: March 23, 2017